UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| LYNDA COHEN, | : | Hon. Joseph H. Rodriguez |
| Plaintiff, | : | Civil Action No. 17-00024 |
| v. | : | OPINION |
| BH MEDIA GROUP, INC. ET AL, | : | |
| Defendants. | : | |

This matter is before the Court on a Motion for Summary Judgment filed by all Defendants. Having considered the parties' submissions, the Court decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78(b). For the reasons stated below, the Court grants in part and denies in part Defendants' Motion for Summary Judgment.

## I.     Background

This case arises out of a series of events that occurred in 2015 through 2016 while Plaintiff, Lynda Cohen ("Plaintiff"), was employed as a staff writer at the Atlantic City Press (the "Press"). Plaintiff was employed by the Press for approximately sixteen (16) years. Compl. ¶ 21. Defendant BH Media Group, Inc., ("BH Media") purchased the Press in or about 2013 and continued operating the entity as a New Jersey news reporting agency. Id. at ¶¶ 9, 24. Plaintiff's employment at the Press continued under BH Media's ownership.

### A.  Plaintiff's Supervisors

The additional Defendants in this case, Ed Steiger ("Mr. Steiger"), Stephanie Loder ("Ms. Loder"), and Winfred (Buzz) Keough ("Mr. Keough"), are also employees of BH Media d/b/a the Press. During Plaintiff's employment, Mr. Steiger, Ms. Loder, and Mr.

Keough each acted as Plaintiff's supervisor. <u>See</u> Part II of Pl. SMF. Beginning in July

2015, Mr. Steiger acted as the Director of Human Resources ("HR"). Pl. SMF ¶ 22. In

this role, Mr. Steiger "reviewed discipline for consistency with the policies issued,

departmental policies and the employee handbook." <u>Id.</u> at ¶ 23. From December 2015

until Plaintiff's termination in July 2016, Ms. Loder acted as Plaintiff's supervisor. Ms.

Loder testified at her deposition that she had the authority to hire, fire, or discipline

employees with consultation of her superiors. Loder Dep. 26:12-27:4. Mr. Keough was

one of those superiors; he acted as Ms. Loder's supervisor and was managing editor of

the Press. <u>Id.</u>; Pl. SMF ¶ 32-33. Ms. Loder was also responsible for approving the payroll

for all of the employees under her supervision. <u>Id.</u> at ¶ 29. It was then the employee's

obligation to "communicate any extra hours worked, and to record those hours for

approval." Def. Resp. SMF ¶ 29.

### B. Plaintiff's Employment Prior to 2015

Prior to 2015, while Mr. Hughes was Plaintiff's manager, he expressed some

difficulties with Plaintiff, including lack of communication about where she was

working. Keough Dep. 40:8-17. Plaintiff stresses that her work performance had never

been an issue before 2015, that she exceeded expectations, and that there was "no

reason for Loder to begin to micro manage plaintiff and prevent her from doing the

work she had always succeeded at doing." Pl. SMF ¶ 71.

According to the record, Plaintiff's last performance evaluations took place in 2011

and 2012, prior to BH Media's takeover. In her March 29, 2011 review, Plaintiff's then

supervisor, Mr. Keough, indicated that her overall performance was satisfactory, or

"meets expectations." Def. Ex. 9. In her role, Plaintiff exceeded expectations for a

number of categories including dependability and adherence to company values and

policies. Mr. Keough also noted that Plaintiff needed improvement in contribution of effectiveness of others, stating that Plaintiff "frequently fires off sarcastic, complaining e-mails to supervisors when she gets an assignment, she does not care for. . . [and] has made threats to quit." Id. Plaintiff's March 2012 review showed improvement. Plaintiff's overall rating was "exceeds expectations." Pl. Ex. 3. Mr. Keough, still her supervisor, noted that Plaintiff provided guidance to newer reporters, and her sources made her the first to get a tip on breaking news.

### C. Plaintiff's Employment from September 2015 through July 2016

#### 1. The Lunch Policy

Effective September 15, 2015, the Press instituted a new lunch policy which required all hourly employees to take an hour-long lunch break (the "Lunch Policy"). [Dkt. No. 36 Pl. Ex. 4, the Press Lunch policy]. The Lunch Policy provided that if an employee opted not to take a lunch break, "it must be approved by the Manager/Supervisor they report to." Id. The policy explained that these "exceptions" should be infrequent. Id. It also included a note from HR stating: "The reason for this policy is to avoid overtime and a penalty that could be imposed by the Federal Wage and Labor Division." Id.  The Lunch Policy further provided that "[c]locking out before an 8 hour shift is completed without approval is prohibited and could result in disciplinary action up to and including termination." Id.

It is undisputed that Plaintiff opposed the Lunch policy. Pl. SMF ¶¶ 38-39, 97. She testified that she communicated her disagreement with the Lunch Policy to her editor, Steve Hughes, which was based on her belief that it was not "federal law" and "did not work with how reporters work." Id. at ¶ 39. She further complained about the policy to Ms. Loder, Mr. Steiger, Mr. Keough, employee Kris Worrel, and other management. Id.

at ¶ 97. Plaintiff initially refused to sign the Lunch Policy and claims that Steve Hughes

told her if she did not sign the policy, she would not get a paycheck. Pl. Dep. 103-2:25.

On September 30, 2015 Plaintiff signed the Lunch Policy acknowledgment form, though

she noted that she was signing the document "under duress." Pl. SMF ¶ 41.

   2.  *The Dayforce Presentation*

   The Press introduced an online payroll system to its employees in late 2015, called

Dayforce. On December 15, 2015, Mr. Steiger and HR and Payroll Administrator, Nancy

Sonnie, conducted a Dayforce training session, to help "acclimate the staff" to the

program. Id. at ¶ 42; Def. SMF ¶ 48. Plaintiff arrived late to the presentation. According

to her, the presentation was informal; multiple people were raising comments and

concerns about various topics, including the Lunch Policy. Pl. SMF ¶ 46. Defendants

state that Plaintiff "became discourteous" at this presentation and was "arguing about

the lunch hour policy." Def. SMF ¶ 49. There is no dispute that Plaintiff made certain

statements about the Lunch Policy—that it was not Federal law, that she could receive

work phone calls during her mandatory lunch hour, and that the policy did not work

with how reporters work. Pl. SMF ¶¶ 50-52. Plaintiff, however, was not the first to bring

up the policy; in fact, other employees agreed with her statements and joined in her

concerns. Id. at ¶¶ 50-57; Pl. Ex. 1. Mr. Steiger exclaimed that the Lunch Policy was not

a matter to be discussed at this particular training and explained Plaintiff could talk to

him about the policy at a different time. Plaintiff told him that she was in the middle of

working and then walked out of the training session before the meeting ended. Def. SMF

¶ 51. Mr. Steiger told Plaintiff that she was disrespectful and rude. Id. at ¶ 50; Pl. SMF ¶

58. The next day, he disciplined Plaintiff with a formal warning regarding her conduct

during the training session. Pl. SMF ¶ 60.

### 3. Ms. Loder becomes Plaintiff's supervisor

According to Plaintiff, Ms. Loder implemented "a whole new regime of rules for plaintiff with no explanation" as her supervisor. Id. at ¶ 67. Ms. Loder communicated these "rules" to her following a situation at work where Plaintiff hung up on a call with senior editor, Steve Hughes. Def. Ex. 3 (D-0611,D-0612). This prompted Mr. Loder to have an in-person conversation with her. Id. Afterwards, Ms. Loder sent a follow-up e-mail explaining to Plaintiff the proper way to handle issues with her editor and stated "when you are not in court, your regular work hours are 9 am to 6 pm with a one hour lunch. Id. You are expected to be working in the office unless other arrangements to work in the field have been discussed." Id. Plaintiff was also required to "let Steve Hughes know what [she was] working on each morning before 9:30 am meeting." Id.; Pl. SMF ¶ 68. Ms. Loder testified, however, that she did not implement or create any new policies or procedures. Loder Dep. 22:11-25.

### 4. Plaintiff's disclosure of medical information

On March 9, 2016, Plaintiff disclosed to Ms. Loder and Mr. Steiger personal medical information. Pl. SMF ¶¶ 73-75. It is undisputed that Plaintiff also told her co-worker, Ms. Gillis, about this personal issue. Def. SMF ¶ 30. To Plaintiff's understanding, Ms. Loder later discussed the information with others in the office. Pl. Dep. 144. Plaintiff expressed to Mr. Steiger that she was upset with Ms. Loder for doing do so. Pl. SMF ¶ 77. She then informed him that Ms. Loder had violated her HIPPA rights. Steiger Dep. 113:19-115:8. Due to the situation, Mr. Steiger conducted a meeting with Ms. Loder and Plaintiff, which he documented in a memo dated March 16, 2016 and placed in both employees' files. Def. Ex. 10. According the memorandum, Ms. Loder apologized to Plaintiff after the information was in fact "leaked" to the news room and Mr. Steiger

explained that he could have handled the issue through the HR Process. Id. Immediately after, Plaintiff took leave from work through April 11, 2016. Pl. SMF ¶ 80.

### 5. The Press' Dress Code Policy

The Press maintains an Appearance/Dress Code Policy (the "Dress Policy"), which was put into effect March 2016 while Plaintiff was on leave. Def. SMF ¶ 7. The policy provides: "Employees must maintain a clean and professional appearance. An employee's attire should be consistent with the type of work performed as well as appropriate for the position held and the image the Company seeks to project." Id. at ¶ 6. The Dress Policy calls for a "Business Causal Attire," and establishes appropriate dress and footwear for both men and women. Id. at ¶ 7. The publisher of the Press sent an e-mail to all employees on March 23, 2016, providing revisions to the new policy. See Pl. Ex. 8. The e-mail stated: "After getting some feedback from everyone, I think we need to make some minor revisions/clarifications to the new dress code policy that goes into effect April 4th." Id. Those revisions included the allowance of three-inch heels, elimination of a hosier/stocking requirement, and permission to wear capris to mid-calf. Some departments, including the IT department, were exempt from the standards as "the type of work that they do dictates a different dress code." Id.

Plaintiff returned to work on April 11, 2016, at which time, she received the Dress Policy. Pl. SMF ¶¶ 82-86. Plaintiff took issue with the policy. Those issues led to a discussion with Mr. Steiger about her concerns with the Dress Policy. Id. During that discussion, Plaintiff revealed to Mr. Steiger that she believed the policy discriminated on the basis of gender and "was sexist and unfair to women." Id. The policy, however, did not contain the revisions. Plaintiff claims that she never received the March revision e-mail. Id. The revisions "partially" resolved Plaintiff's specific issues with the Dress

Policy, but she still contested the policy. Pl. SMF ¶ 87. Specifically, "[t]here was still some limitations on shoes," exemptions for all male departments who were able to wear jeans, and lengths of women's pants. Pl. Dep. 291. While Plaintiff admits that the exemption for the press room department made sense, she states that the IT department was all male and thus, was still a discrimination issue. Id. at 293:3-9.

6. *Rules about Overtime and compensation*

The Press' employee handbook contains wage and hour policies. Def. Ex 6. Defendant's overtime policy, states as follows:

> If a non-exempt employee would like to work overtime hours, he/she must receive proper authorization from his/her supervisor before working the overtime hours. Overtime will be paid at one and a half (1 ½) times the regular rate of pay. Only those hours actually worked in excess of forty (40) hours in a work week will be paid at the overtime rate. Some exceptions may be made based on department, location and work status.

Id. at 13. The policy further explains that

> If an employee is eligible for overtime pay or extra pay, he/she must maintain a record of the total hours worked each day. These hours must be accurately recorded electronically. Each employee must sign his or her time record electronically to verify that the reported hours worked is complete and accurate (and that there is no unrecorded or "off-the-clock" work). Employee time records must accurately reflect all regular and overtime hours worked . . .

Id. at 14. Finally, the employee handbook provides that "[a]ny employee who fails to report or inaccurately reports any hours worked will be subject to disciplinary action, up to and including termination of employment." Id.

According to Plaintiff, "employees were not to put in any overtime unless it was approved and there was no overtime approved." Pl. SMF ¶ 95. Plaintiff, however, did receive overtime on more than one occasion during her employment with the Press. Def SMF ¶ 25. Specifically, since April 2014 Plaintiff received overtime on twelve (12)

occasions, six (6) of those twelve (12) being between 2015 and 2016. Id. Still, Plaintiff states that she was not to put in more than 40 hours a week, "if she did, it would be a problem and she could be terminated," and she was afraid to do so. Pl. SMF ¶¶ 99-98. Nonetheless, Plaintiff worked over 40 hours per week "because that was the way news happened." Id. at ¶¶ 100-101. She also entered a one-hour daily lunch break, pursuant to the policy, even though she worked during that hour and was required to be on call. Id. at ¶¶ 102, 105. Ms. Loder testified there is "a shift that a reporter works" and when breaking news occurred after a shift there "would be a determination by an editor who was present to send a reporter that was available." Def. Resp. SMF ¶¶ 113-14. According to Ms. Loder, if Plaintiff "covered an actual breaking news assignment . . . if she actually covered something, she would be compensated." Loder Dep. 42:10:23.

### 7. Plaintiff's use of Dayforce

Plaintiff was trained and provided materials on how to use the Dayforce system. Pl. Dep. 97. Plaintiff testifies that Dayforce experienced glitches, though once those passed, she understood how to use it and understood that it was her responsibility to enter her time. Pl. Dep. 98:15-99:2. Mr. Steiger testified that at one point he also walked Plaintiff though how to use Dayforce. Steiger Dep. 85:15-23. But Plaintiff reported to Ms. Loder and Mr. Steiger that she could not put her time in Dayforce outside of the office. See Pl. Ex. 9.

Plaintiff admits that she did not always enter her time in Dayforce. On May 12, 2016, Ms. Loder e-mailed Plaintiff asking her to fill in her timesaver account and claiming that other managers kept reminding her that Plaintiff was not filling in her timesheets. Def. Ex. 3 (D-0649, 0659). The next day, another reminder e-mail to Plaintiff was sent stating, "you didn't fill out your timesheet for last pay period. I asked you Wednesday to

fill out your timesaver for this pay period because you would be off Friday, but you didn't do it." Id. That same week Mr. Steiger sent a reminder to all employees regarding Dayforce. That e-mail stated: "employees who work Monday through Friday all your hours need to be done by end of today [Friday, May 13, 2016]. For employees who are working the weekend, please input your hours no later than Sunday by 3pm." Def. Ex. 3 (D-0650). Plaintiff responded to Ms. Loder explaining that she could not enter her time from outside. Pl. Ex. 9.

### 8. *Plaintiff's Discipline*

#### a. Failure to Record Time Worked in Dayforce

On May 19, 2016, Mr. Steiger issued Plaintiff a written warning regarding her failure to input her time in Dayforce.[1] See Pl. Ex. 11. Mr. Steiger discussed this disciplinary action with Plaintiff. Def. SMF ¶ 73. The warning details the e-mail exchanges between Ms. Loder and Plaintiff, and Mr. Steiger and Plaintiff, wherein they reminded and explained to Plaintiff she must complete her timesheets. Pl. Ex. 11. The warning also stated that Plaintiff should not have an issue filling out her time sheet outside of the workplace because all employees were able to download the Dayforce Application on their company phones. Id. Plaintiff admits that the statements in the warning are accurate but claims that neither of her company issued devices, her phone and Netbook, would allow her to download the app referred to. Pl. Dep. 169.

---

[1] Around the same time, Ms. Loder requested an e-mail thread regarding an error in Plaintiff's story from March 2016 be added to her file. The alleged error was a misidentified name, which Plaintiff explained was the name provided, and was even corrected back in March when the story ran.

### b. The John Brooks Story and the Fire Chief Story

On June 13, 2016, Ms. Loder disciplined Plaintiff for "unsatisfactory work quality, [and] failure to communicate and follow directions," concerning two separate incidents. Def. SMF ¶ 78. The first incident, according to Defendants, concerned Plaintiff's failure "to write a story assigned to her" (referred to as the "John Brooks story"). Def. SMF ¶ 80. Ms. Loder testified she verbally assigned Plaintiff a 2:30 p.m. deadline for a story, the inside "copy deadline." Loder Dep. 158:7-22. Defendants state that Plaintiff submitted the story "more than four hours late" to the copy desk. Def. SMF ¶ 80. Plaintiff, however, states that she sent the story around 2 p.m. Pl. SMF ¶ 150.

Plaintiff was also disciplined for her actions surrounding the "fire chief story." The disciplinary action form states that Plaintiff "did not immediately respond to an editor's request to cover the swearing in of the new fire chief in Atlantic City." Pl. Ex. 17. Plaintiff states that at some point, she went to Atlantic City, wrote up the story, and posted it by 4:00 p.m. Pl. SMF ¶ 154. Ms. Loder claims that Plaintiff never called to say the story was in. According to Plaintiff, she obtained the details on the fire chief promotion and told Christan, an employee in the newsroom, that she was writing up the story in her car. Pl. SMF ¶ 160; Pl. Ex. 18. Plaintiff could not answer Ms. Loder's calls because she was getting information from the Mayor. She did text Ms. Loder to inform her that the story was posted around 4:00 p.m., and again at 4:36 p.m. Pl. SMF at ¶¶ 159, 162-64.

The day after receiving disciplinary action for those two incidents, Plaintiff requested a new supervisor. Id. at ¶ 167. Mr. Keough explained that he did not think that a change in supervisors was warranted. Pl. Ex. 20. He believed that the solution to Plaintiff's problem with Ms. Loder was "communication," and he suggested that they

both sit down and agree on a how to better communicate with each other. Def. SMF ¶ 83. Plaintiff also requested a copy of her personnel file. Pl. Ex. 21.

### c. The Tim McGraw Concert

On June 2, 2016, Mr. Keough asked Plaintiff is she was interested in covering the Tim McGraw concert that upcoming 4th of July; Plaintiff was interested and offered to help with the coverage. A few weeks later, Mr. Hughes sent an e-mail to the entire coverage team proposing a meeting for June 30th, 2016 "to finalize our plans for the concert." Def. Ex. 3 (D-706). Plaintiff responded that she would be working a short day and would not make the suggested time. Mr. Hughes asked about Plaintiff's schedule to accommodate when she would be in the office to talk. Plaintiff then stated "you're making me do the early business end? Really?" Id. (D-703). To which Mr. Hughes stated that he knew she volunteered for the coverage and thought he was doing her a favor with that assignment as Plaintiff was a fan of the singer. He e-mailed her saying "you could stay and enjoy the show without having to work during it or leave to go file." Id. But Plaintiff said that if she knew that was the plan, she would have declined to help cover the concert.

On June 29, 2016 Plaintiff asked Mr. Steiger is there "any rules about spouses/domestic partners not having a supervisory relationship?" The e-mail concerned Mr. Hughes and another female employee, Sarah, who were cohabiting. Sarah was also assigned to the concert. Pl. SMF ¶¶172-75. Plaintiff states she expressed her concerns to Mr. Keough that Sarah "was given favorable treatment for the concert." Id. Mr. Keough discussed with Plaintiff the fact that Sarah "covered features and had written about concerts and was suited for the job—the assignment." Def. Resp. SMF ¶ 175. "Plaintiff admits that there was nothing in her public safety beat job duties that

included concerts," the concert assignment was outside of her normal duties at the Press. Id.

The next morning Plaintiff e-mailed Ms. Loder, Mr. Keough, and Mr. Hughes regarding her concert assignment, in which she again expressed that she would have not volunteered for the story if she knew her particular assignment. Def. Ex. 3 (D-0696). She expressed that in the future she would like to be informed of assignments before a final plan and asked again if she would still like to work that day. Id. After the e-mail was sent, an editor, Kris Worrell e-mailed Plaintiff's supervisors asking if Plaintiff could be replaced on the coverage as she did not want to "send a reluctant reporter." Id. (D-0700). Mr. Keough responded to Plaintiff later that afternoon stating "it is clear that you have no enthusiasm for the assignment, so you're relived of it. Treat the July 4th as holiday." Id. (D-0696). On July 5th, Plaintiff was issued another disciplinary action, in part addressing the issue over the concert coverage. The discipline form stated issues with Plaintiffs comments, reluctance to cover the event, and unrelated failure to communicate about hours she worked. Id. (D-0078). Ms. Loder suggested that Plaintiff be terminated. Id. Thereafter, on July 5, 2016, the Press terminated Plaintiff's employment.

**D. The Department of labor Investigation**

According to the Plaintiff, Mr. Steiger informed her that the Press was being Investigated by the Department of Labor ("DOL").  Plaintiff claims she later communicated with an investigator, Mr. Guzman, and e-mailed him her concerns about the Lunch Policy. Pl. Ex. 36.[2] The DOL conducted an inspection of the Press on May 20,

---

[2] Defendants claim Plaintiff never produced any information on her communication with the DOL in discovery.

2016. Mr. Steiger was the one responsible for communicating with the DOL in regard to its investigation. He testified, however, that he did not receive any information about Plaintiff in connection with that investigation and that he was unaware that any employees were asked to fill out information about wages and time records. Steiger Dep. 237-43. The DOL investigation was still in progress as of January 17, 2017.

### E. Procedural History

Plaintiff filed a Complaint with this Court against all Defendants on January 3, 2017, alleging claims for unpaid wages and retaliation under the Fair Labor and Standards Act and New Jersey Wage and Hour Law (Count I); violations of New Jersey Law Against Discrimination (Count II); and violation of the New Jersey Conscientious Employee Protection Act (Count III). Defendants filed an Answer to Plaintiff's Complaint. [Dkt. Nos. 1, 9-11]. Defendants now move for summary judgment on all of Plaintiff's claims. [Dkt. No. 32]. The motion has been fully briefed by the parties and is ripe for decision. [Dkt. Nos. 36, 38].

## II.      Summary Judgment Standard

A court will grant a motion for summary judgment if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. <u>Pearson v. Component Tech. Corp.</u>, 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)); <u>accord</u> Fed. R. Civ. P. 56 (c). Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. <u>Id.</u> In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. <u>Id.</u>; <u>Maidenbaum v. Bally's Park Place, Inc.</u>, 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. <u>Andersen</u>, 477 U.S. at 256–57. Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Celotex</u>, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. Credibility determinations are the province of the finder of fact. <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).

III.    <u>Analysis</u>

**A. Plaintiff's Claims under the Fair Labor and Standards Act and New Jersey Wage and Hour Law**

Defendants move for summary judgment on Count I of Plaintiff's Complaint wherein Plaintiff alleges violations of the Fair Labor and Standards Act ("FLSA") and New Jersey Wage and Hour Law ("NJWHL"). Specifically, Count I alleges claims for unpaid wages and unlawful retaliation. As an initial matter, Defendants argue that Plaintiff's claims under the NJWHL are preempted by her FLSA claims. The Court disagrees.

The FLSA's savings clause states: "No provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter or a maximum work week lower than the maximum workweek established under this chapter." 29 U.S.C. § 218(a). The Third Circuit, in <u>Knepper v. Rite Aid Corp.</u>, found that the presence of the savings clause undermines any suggestion that Congress intended to occupy the field of wage and hour regulation. Having come to such conclusion, the court held that the Maryland Wage and Hour law, which establishes the same protections as the FLSA, was not preempted by its federal counterpart. 675 F.3d 249, 262 (3d Cir. 2013).

The NJWHL is similar to the Maryland WHL in that the New Jersey law affords the same protections as the FLSA. <u>See</u> N.J. Stat. Ann. 34:11-56a4. In the present case, Defendants argue to dismiss Plaintiff's NJWHL claims on the basis of preemption, relying solely on the district court case, <u>Kronick v. Bebe Stores, Inc.</u>, 2008 WL 4509610 (D.N.J. September 29, 2008). The <u>Kronick</u> court held that the plaintiff's <u>state common law</u> claims were preempted by the FLSA. <u>Id.</u> Therefore, the Court finds that Defendants

reliance on <u>Kronick</u> is misplaced. Defendants provide no other reason this Court should find that the FLSA preempts the NJWHL. Given that, and in light of the Third Circuit's ruling, the Court declines to dismiss Plaintiff's NJWHL claims on preemption grounds. Therefore, the Court will proceed with an analysis of the substantive claims under both statutes.

   1.   *Unpaid wages*

Defendants argue that they are entitled to judgment as a matter of law on Plaintiff's claim for unpaid overtime under both the NJWHL and FLSA because she was properly compensated throughout the duration of her employment. The Court disagrees.

"The FLSA establishes federal minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract." <u>Genesis Healthcare Corp. v. Symczyk</u>, 569 U.S. 66, 69 (2013). The NJWHL is the New Jersey state equivalent of the FLSA, it requires employers to compensate employees at a wage rate no less than the federal minimum set by the FLSA. N.J. Stat. Ann. 34:11-56a4. "The Supreme Court of New Jersey has recognized the similarity between the statutes, adding that '[s]tatutes addressing similar concerns should resolve similar issues ... by the same standard.'" <u>Brunozzi v. Crossmark, Inc.</u>, No. 13-4585, 2016 WL 112455, at *5 (D.N.J. Jan. 11, 2016) (quoting <u>Hargrove v. Sleepy's LLC</u>, 106 A.3d 449, 458 (N.J. 2015)). Therefore, the Court will analyze Plaintiff's FLSA and NJWHL claims simultaneously.

Plaintiff's Complaint alleges that "Defendants failed and refused to pay her wages for all hours worked during the workweek." Compl. ¶ 79. Plaintiff now seeks to recover for that unpaid overtime. "A plaintiff-employee seeking to recover for [sic] unpaid overtime under the FLSA bears the burden of proving she performed work for which she was not compensated." <u>Brunozzi</u>, 2016 WL 112455 at *4. Accordingly, a claim for overtime must

"sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours." Lundy v. Catholic Health System of Long Island Inc., 711 F.3d 106, 114 (2d Cir. 2013) (citing 29 U.S.C. § 207(a)(1)). Though Defendants claim that Plaintiff has failed to show any actual instance where she was not properly compensated, the record presents a genuine dispute over the hours Plaintiff was actually working and thus, whether Plaintiff was paid for all time worked.

As a staff writer, Plaintiff was a "40-hour workweek" employee, as is also evident from her time records. Loder Dep. 10-13; Def. Ex. 3 (Dayforce records). Her "scheduled" hours were Monday through Friday 9 a.m. to 6 p.m. Plaintiff, however, claims she would receive and reply to work communications outside of these hours. Her supervisor would not compensate her for time e-mailing back and forth outside of these hours. Loder Dep. 42:20-23. In addition, Plaintiff asserts that "she was always expected to be and was on call and worked through her lunch hour," which was unpaid. Pl. Op. at 28. Pursuant to FLSA regulations, an unpaid meal period must be one which:

> The employee must be completely relieved from duty for the purposes of eating regular meals. Ordinarily 30 minutes or more is long enough for a bona fide meal period. A shorter period may be long enough under special conditions. The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating.

29 C.F.R. § 785.19. Plaintiff argues that she never actually took a lunch break "where she was completely relieved from duty." Pl. Op. at 28. She testified that she was always expected to be on call and worked through some of the lunch periods. Pl. Dep. 231:1-5. If Plaintiff worked during her hour lunch period, in addition to a full work week, she worked in excess of 40 hours. Plaintiff claims she received calls, conducted interviews and specifically asserts that she wrote the fire chief story during her lunch hour and was

not paid for that hour. Pl. Dep. 181:11-18; 241. In a light most favorable to Plaintiff, the record also shows that Plaintiff was getting a commentary for the fire chief story after 4:30 p.m. and continued to communicate with Ms. Loder until at least 6:00 p.m. See Def. Ex. 3 (D-0548, e-mail dated June 10, 2016 4:36 p.m.; D-0574, e-mail dated June 10, 2016 6:09 p.m.). Plaintiff's Dayforce records show that she was not paid for any work after 4:30 pm, nor was she paid for her recorded lunch hour. Plaintiff had worked a 40-hour week (without accounting for such time). Id. (D-0508). Therefore, Plaintiff provides sufficient evidence that she was not compensated for time she was working in excess of 40 hours.

To recover under the FLSA, however, Plaintiff must also establish "that the defendant-employer had either actual or constructive knowledge of the plaintiff's overtime work." Brunozzi, 2016 WL 112455, at *4 (quoting Alers v. City of Phila., 919 F. Supp. 528, 558 (E.D. Pa. 2013)). "An employer who is armed with [knowledge that an employee is working overtime] cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation." Newton v. City of Henderson, 47 F.3d 746, 748 (5th Cir. 1995) (quoting Forrester v. Roth's I.G.A. Foodliner, Inc., 646 F.2d 413, 414 (9th Cir.1981)).

Here, Plaintiff argues that Defendants knew or should have known that Plaintiff worked more than 40 hours because breaking news, which Plaintiff handled, happens all the time. As a news reporting business Defendants were aware of that fact and, indeed Ms. Loder agreed that Plaintiff could receive calls outside her shift hours. Ms. Loder was also aware that she personally had communicated with Plaintiff outside those hours. Additionally, Plaintiff alleges that Defendants had knowledge of her working

overtime by way of her complaints. Plaintiff specifically complained to her superiors that the Lunch Policy was not conducive to the role of a reporter. In doing so, Plaintiff stated she <u>could</u> receive calls or a story while "on break." Notwithstanding, there is no dispute that Plaintiff was compensated for all of the time she entered into Dayforce, including overtime hours she recorded. The record shows that Plaintiff was paid overtime on six (6) occasions between 2015 and her termination in 2016. In that regard, Defendants argue that Plaintiff's claim must fail because it was her obligation to enter her time worked and her allegations rely on time improperly worked off the clock or inaccurately recorded and therefore, cannot preclude summary judgment. Def. Brf. at 4, 5. In this case, Plaintiff does not dispute that she was responsible for entering her time worked into her employer's online payroll system, nor does she contest that she claims compensation for certain hours she did not record.

Courts have held that plaintiffs who are responsible for recording their own time but fail to report accurate hours worked, have failed to establish a claim for unpaid wages without further evidence that the employer knew or should have known of those hours anyway. <u>See</u> <u>Newton</u>, 47 F.3d at 749–50; <u>Forrester</u>, 646 F.2d at 414; <u>Wood v. Mid–Am. Mgmt. Corp.</u>, 192 Fed. Appx. 378, 379 (6th Cir. 2006). But when a plaintiff can present evidence "to suggest that Defendants attempted to discourage or squelch accurate overtime reporting," he/she can show that a genuine dispute as to defendant's knowledge of the time worked precludes granting summary judgment in defendants favor. <u>Stanislaw v. Erie Indem. Co.</u>, No. CA 07-1078, 2012 WL 517332, at *6 (W.D. Pa. Feb. 15, 2012); <u>see</u> <u>also</u> <u>Brunozzi</u>, 2016 WL 112455, at *4 ("When an employer encourages employees to misreport their hours, it cannot claim it had no knowledge of the underreporting." (citations omitted)). Accordingly, the pertinent issue to be decided

is whether Defendants in this case discouraged or suppressed employees, like Plaintiff, from accurately reporting their time, including overtime and time worked during any lunch hour.

Plaintiff argues that due to the Press' policies, she often worked more than 40 hours a week without recording such hours and without compensation. It cannot be disputed that the Press' policies prohibited reporters, like Plaintiff, from working more than 40 hours a week without advance approval. Def. Ex. 6 at 13. According to Plaintiff, absent such approval, Defendants would subject employees to discipline for violation. She claims that it became known in the news room that the reporters "were not to put in more than eight hours, that if [they] did it would be a problem and [they] could be terminated." Pl. Dep. 297:1-13. Plaintiff further contends that she could not obtain approval of overtime unless it was explicitly requested by her supervisors. According to the record, Mr. Steiger agreed that approval of overtime hours could not always be obtained. Additionally, as mentioned, the Press' Lunch Policy requires employees to take a one-hour unpaid lunch break. That policy states that exceptions (allowing employees to work during the hour) should be "<u>infrequent</u>." Def. Ex. 3. Plaintiff argues she could receive calls at <u>any time</u> related to work, and therefore she could not obtain advance approval to skip a lunch break. Generally, Plaintiff alleges that she was "scared" to input her actual hours worked in fear of discipline. Pl. SMF ¶ 98-99.

To be sure, it is not clear whether overtime would have been approved, if requested. Ms. Loder testified  that she approved pay roll by ensuring employees' recorded time in Dayforce "correlated" with their respective shift, and that the employee worked an eight (8) hour day. However, she explained that if Plaintiff had told her about working outside her schedule, she would have been compensated for her time. Loder Dep. 39-40. Mr.

Steiger also testified that overtime work needed to be communicated at "some point," and that he explained to employees, including Plaintiff, that they "are to record every moment [they] work for the company." Steiger Dep. 40:2-6. Nevertheless, such conflicting testimony does not warrant summary judgment. The Court must construe all reasonable inferences in favor of Plaintiff and must reserve credibility determinations for the trier of fact. Therefore, the Court finds that a genuine dispute of fact exists as to whether Defendants were aware of Plaintiff unreported (unpaid) hours. Accordingly, the Court denies summary judgment as to Plaintiff's FLSA and NJWHL claims for unpaid wages.

### 2. *Retaliation*

Next, Defendants argue that they are entitled to summary judgment on Plaintiff's FLSA and NJWHL retaliation claims because Plaintiff cannot establish her *prima facie* case; particularly, they argue Plaintiff has not engaged in any protected activity.

Under the FLSA, it is unlawful to "discharge or in any matter discriminate against an employee because that employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter . . ." See 29 U.S.C. § 215(a)(3).[3] The anti-retaliation provision of the FLSA, is interpreted liberally and protects a wide range of actions. See Brock v. Richardson, 812 F.2d 121, 123 (3d Cir. 1987).

Claims of unlawful retaliation under the FLSA and NJWHL are analyzed using the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S.

---

[3] Similarly, the "NJWHL also protects workers from retaliation for complaining" under N.J. Stat. Ann. 34:11–56a24. Chen v. Domino's Pizza, Inc., No. CIV.A. 09-107, 2009 WL 3379946, at *3 (D.N.J. Oct. 16, 2009).

792, (1973). See Cononie v. Allegheny General Hosp., 29 Fed. App'x. 94, 95 (3d Cir. 2002); Weston v. Pennsylvania, 251 F.3d 420, 432 (3d Cir. 2001). Pursuant to the McDonnell Douglas framework, plaintiff's initial burden requires her to demonstrate a *prima facie* case of retaliation. McDonnell Douglas, 411 U.S. at 802. To establish a *prima facie* case of retaliation under the FLSA, a plaintiff must show that: (1) she engaged in protected activity; (2) she suffered an adverse employment decision; and (3) the adverse decision was causally related to the protected activity. Conoshenti v. Public Elec. & Gas Co., 364 F.3d 135, 146–47 (3d Cir. 2004).

The nature of a plaintiff's protected activity under 29 U.S.C. § 215(a)(3) is also liberally construed. In this regard, oral complaints, as opposed to written complaints, may constitute protected activity. See Kasten v. Saint–Gobain Performance Plastics Co., 563 U.S. 1, 14 (2011). An oral complaint is considered protected activity when it puts an employer on notice of a claim under the FLSA. The oral complaint must be sufficiently clear and detailed so as to demonstrate that the employee is asserting rights protected by the FLSA. Id. A plaintiff in a retaliation action is not required to show her employer actually violated the FLSA, rather plaintiff's good faith belief that her employer is in violation is sufficient. See Saffels v. Rice, 40 F.3d 1546, 1549–50 (8th Cir. 1994).

Here, Plaintiff argues that she engaged in protected activity under the FLSA when (1) she refused to sign her employer's Lunch Policy and (2) objected to Defendants failure to compensate her for her lunch hour. It is undisputed that Plaintiff took issue with the Press' Lunch Policy because she "did not agree with the policy." Pl. Op. at 6. Defendants, however, argue that Plaintiff's complaints do not constitute protected activity. In support of that argument, Defendants cite Campbell v. Cty. of Monmouth,  No. CIV. 11-6210, 2015 WL 3626694, at *3 (D.N.J. June 10, 2015). The Campbell court held that a

plaintiff's repeated requests to be paid for lunch time pay were insufficient to constitute protected activity. There, the content of plaintiff's requests for pay did not mention the FLSA "or any illegality." Id. Instead, the court found the plaintiff's complaints were bare assertions for compensation. In context, plaintiff's one mention of "labor law" did not provide evidence suffice to preclude summary judgment because it was made before the employer had stopped paying the plaintiff. Id.

The Court begins by addressing Plaintiff's refusal to sign the Press' Lunch Policy. According to Plaintiff, she told Mr. Steiger that the Lunch Policy "was not a federal law." Id. When Defendants asked Plaintiff to sign that policy, she initially refused. Plaintiff did mention federal and state law when expressing her disagreement with the Lunch policy at issue. The content of Plaintiff's first alleged complaint, however, relates to her belief that no law required an unpaid lunch period for adult employees. In that regard, Plaintiff does not provide evidence that she asserted FLSA rights to be paid for her lunch period. Plaintiff provides no evidence that she complained that the rule violated law or was otherwise illegal. In context, Plaintiff's own testimony explains that when she refused to sign the Lunch Policy her position was, "I disagreed with it, that there wasn't a federal law, that it didn't work with how reporters work." Pl. Dep. 103:15-21. Indeed, upon ultimately signing the policy Plaintiff also made a written note, "signed under duress strongly disagree with policy." Def. Ex. 3 (D-0205). There is no other indication of why she originally refused to sign. Id. Therefore, Plaintiff has not provided evidence to dispute that such statements, in light of their content and context, were simply oppositions to a policy Plaintiff stressed was not "conducive to how reporters worked." Pl. Dep. 295:18-25.

Similarly, the Court finds that Plaintiff has not produced sufficient evidence that she engaged in protected activity by way of her informal complaints at the Dayforce training session in December 2016. Plaintiff attended this training session held by Defendant Steiger, during which she expressed her concerns about the Lunch Policy. According to Plaintiff, she made a number of statements regarding the Lunch policy including that (1) the policy was not federal law, (2) the policy did not work for reporters, and (3) the law required to be paid for all hours worked and "employees should be paid for their lunch unless they perform no work at all."[4] Pl. SMF. ¶¶ 47-57. Defendants recognize that Plaintiff contested the Policy and mentioned federal and state law in connection with her concerns at the presentation.[5] Notwithstanding, Plaintiff has failed to establish a genuine dispute of fact as to whether she engaged in protected activity.

The Supreme Court of the United States has held that "the phrase 'filed any complaint' contemplates some degree of formality, certainly to the point where the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand the matter as part of its business concerns." Kasten, 563 U.S. at 14. Neither the context of Plaintiff's statements nor the content offered fair notice of a grievance in which Plaintiff was asserting rights protected under the FLSA with a call to protect them. Even accepting Plaintiff's view of the facts, she could not have been

---

[4] Defendants have asked this Court to disregard Plaintiff's declaration as a "sham declaration," and afford it no weight in the court's determination on this motion. To the extent that certain facts alleged in Plaintiff's declaration supplement and/or contradict with her deposition testimony, the Court will disregard those facts. However, the Court finds that the pertinent statements Plaintiff provides in support of her arguments do not present such an issue. Specifically, Plaintiff's declaration statements regarding the Dayforce presentation are consistent with her deposition testimony.

[5] Mr. Steiger also testified that Plaintiff complained about the Lunch Policy and made statements about how "people" do not understand how many hours "we" work and about her concerns that reporters cannot take lunch breaks. Steiger Dep. 39:17-40:1, 44.

asserting FLSA/NJWHL rights because at this point (1) Plaintiff did assert that she actually worked through any lunch hour; and (2) Plaintiff did not make any request to be paid for any lunch hour. There is also no dispute that Plaintiff voiced her concerns with other employees at the Dayforce session. At that time, employees were discussing administratively how and if the lunch hour should be put into their timesheets. Multiple employees were raising general questions and concerns as to how the lunch policy would work with their schedules. Pl. SMF ¶¶ 46-49. The basis of the conversation, therefore, revolved around employee <u>disagreement</u> over the policy as a whole because it could not "work" with how reporters work—which plaintiff previously made apparent. When viewed in context, therefore, Plaintiff's complaints do not rise to the degree of formality required under the FLSA.

Furthermore, even assuming <u>arguendo</u> that Plaintiff did engage in protected activity when she complained about the Lunch Policy at the Dayforce presentation, Plaintiff cannot show a causal connection between such activity and her termination. First, Plaintiff alleges that there is a causal relationship between her Dayforce complaint and the disciplinary action that immediately followed on December 16, 2016. Plaintiff's discipline, however, does not constitute an adverse employment action under the FLSA.

"Under the FLSA, retaliatory conduct rises to the level of a materially adverse action if the conduct alters the 'employee's compensation, terms, conditions or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'" <u>Goins v. Newark Hous. Auth.</u>, No. CV152195, 2019 WL 1417850, at *15 (D.N.J. Mar. 29, 2019) (quoting <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286, 1301 (3d Cir. 1997)). Following the Dayforce training incident, the Press issued a warning against Plaintiff. That warning had no impact on Plaintiff's employment. <u>See</u>

Sconfienza v. Verizon Pennsylvania Inc., 307 F. App'x 619, 622 (3d Cir. 2008) (holding that "a warning about future penalties, which had no adverse impact on [employee]'s employment, did not affect her compensation, and did not impede her ability to receive a transfer or promotion" was not an adverse action under the FLSA). That leaves Plaintiff with one actionable adverse employment action, her termination.

Plaintiff does not directly argue that there is any causal relationship between her opposition to the Lunch Policy and her termination. A causal connection may be established by circumstantial evidence, such as temporal proximity, a pattern of antagonism, and pretext. Kachmar v. SunGard Data Sys., 109 F.3d 173, 177 (3d Cir. 1997). This indirect evidence is to "be considered with a careful eye to the specific facts and circumstances encountered." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279, n. 5 (3d Cir. 2000). Here, the Press terminated Plaintiff's employment on July 5, 2016, more than 6 months after her comments regarding the policy at the Dayforce training session. Thus, the temporal proximity is insufficient to establish a causal link. See Goldsmid v. Lee Rain, Inc., No. CIV.A. 12-3666, 2014 WL 495717, at *6 (D.N.J. Feb. 6, 2014) (finding three-month gap not unusually suggestive to establish causal link).

"Where the time between the protected activity and adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee." Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007), as amended (Aug. 28, 2007). Here, the evidence presented does not raise an inference that the reason for Plaintiff's termination was her assertion of FLSA rights. While Plaintiff's brief suggests that her employment in the intervening months between her complaints and her termination present a causal connection, the Court disagrees.

26

The record is undisputed in that other employees discussed and disagreed with the Lunch Policy, openly agreed with Plaintiff's views about the policy, and made negative statements concerning the Lunch Policy in front of management. Pl. Dep. 295:18-25; see also Pl. Ex. 1. According to Plaintiff, Defendants did not discipline or terminate these other employees. Under these circumstances, Plaintiff's testimony and arguments raise an inference against retaliatory motive. Plaintiff does not provide evidence of specific comparators to show that she was treated less favorably than employees who did not engage in what Plaintiff alleges was protected activity. Accordingly, the Court finds that Plaintiff fails to create a genuine issue for the Jury. Therefore, the Court grants summary judgment in favor of Defendant on each of Plaintiff's retaliation claims in Count I.

### B. Plaintiff's CEPA claim

Defendants move for summary judgment on Count III of Plaintiff's Complaint. Count III alleges violations of the New Jersey Conscientious Employee Protection Act ("CEPA"). Plaintiff claims that Defendants retaliated against her for objecting to certain policies and practices in contravention to CEPA by "subjecting plaintiff to pretextual discipline and ultimately terminating plaintiff." Compl. ¶¶ 92-94. Defendant argues that Plaintiff again cannot establish her *prima facie* case to sustain a claim for retaliation, specifically that she cannot show she engaged in protected whistleblowing. Even if Plaintiff can establish a *prima facie* case, Defendant further argues that her claim fails because she cannot show her termination was pretextual. Def. Brf. 18. The Court disagrees, genuine factual disputes preclude Summary Judgment on Plaintiff's CEPA claim.

CEPA provides in pertinent part that: An employer shall not take any retaliatory action against an employee because the employee does any of the following:

a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes: (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . or (2) is fraudulent or criminal . . .

b. Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer, or another employer, with whom there is a business relationship; or

c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
(1) is in violation of a law, or a rule or regulation promulgated pursuant to law;
(2) is fraudulent or criminal; or
(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

N.J. Stat. Ann. § 34:19-3. CEPA is "remedial legislation' meant 'to protect employees who report illegal or unethical workplace activities.'" Dominguez v. Costco Wholesale Corp., 356 F. App'x 611, 613 (3d Cir. 2009) (quoting Fleming v. Corr. Healthcare Solutions, Inc., 751 A.2d 1035, 1038 (N.J. 2000)). The framework for analyzing CEPA claims is analogous to FLSA and NJLAD claims, which use the McDonnel Douglas burden-shifting framework. Donofry v. Autotote Sys., Inc., 795 A.2d 260, 269 (N.J. App. Div. 2001) ("It is also plain that the methods of proof and the applicable burdens in LAD and CEPA cases generally follow Title VII law, and we therefore frequently look to federal as well as state discrimination and retaliation cases as precedent."). Therefore, the plaintiff must meet her initial burden by establishing a prima face case. To establish a *prima facie* face of retaliation under CEPA, plaintiff "must demonstrate that (1) he or she reasonably believed that the employer's conduct violated a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she

performed a "whistle-blowing" activity described in [the act] (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action." Id. at 614.

### 1. *Whistleblower Activity*

Plaintiff claims she "made multiple disclosures that constitute whistleblowing activity under CEPA," including: (1) Disclosing and objecting to the Press' Dress Policy as discriminatory; (2) participating in a DOL investigation and providing the DOL with information; and, (3) objecting to the Lunch Policy and refusing to sign it.[6]

First, the Court will address Plaintiff's participation in the DOL investigation against her employer. Plaintiff has supplied documentation, such as e-mails between herself and a DOL investigator, as evidence of her participation and communication with the DOL. Defendants argue that Plaintiff failed to supply those documents in discovery. Pursuant to the Federal Rules of Civil Procedure "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Therefore, Defendants argue that the Court should not consider the e-mail exchange between Plaintiff and the DOL. The Court agrees. Moreover, even if the Court were to consider the documents Plaintiff has attached to its motion, those documents fail to provide any evidence that Defendant knew about Plaintiff's participation in any investigation. Thus,

---

[6] Plaintiff's Complaint also discusses that Plaintiff reported her belief that the Defendants had violated her HIPPA right to one other supervisors. Defendant's address this allegation in their brief and argue that Plaintiff did not engage in CEPA protected activity because she is the one who first divulged the personal information to more than one staff member. Plaintiff disregards this argument and does not allege facts relating to this incident in her brief. Accordingly, Plaintiff does not oppose Defendant's argument and the Court will not address the issue in detail.

Plaintiff cannot show that she participated in whistleblowing activity by way of her participation in the DOL investigation. <u>See</u> <u>Dominguez v. Costco Wholesale Corp.</u>, 356 F. App'x 611, 614 (3d Cir. 2009) (affirming summary judgment in favor of the defendant on plaintiff's CEPA claim where plaintiff pointed to no evidence that the decision-makers or managers involved in plaintiff's termination knew about his protected activity prior to their decision).

With regard to Plaintiff's complaints about the Press' Lunch Policy, the Court has already explained in detail <u>supra</u> the content and context of those statements. The Court reiterates that Plaintiff's objections to the Lunch Policy did not assert that the policy itself was illegal, rather her objections expressed strong disagreement with the policy based on Plaintiff's belief that the policy was incompatible with her role as a reporter. Although CEPA is liberally construed, "CEPA is not intended to shelter every alarmist who disrupts his employer's operations by constantly declaring that illegal activity is afoot—or, as in this case, is about to be afoot." <u>Blackburn v. United Parcel Serv., Inc.</u>, 179 F.3d 81, 94 (3d Cir. 1999).

In contrast, Plaintiff's complaints about the Dress Policy do constitute whistleblowing activity under CEPA. Here, Plaintiff explicitly told her supervisor that she thought her employer's dress policy was sexist and discriminated on the basis of gender, as it was unfair to female employees. As such, Plaintiff disclosed to a supervisor that a policy of her employer was in violation of a law, protected under N.J. Stat. Ann. § 34:19-3(a)(1) and objected to said policy, protected under § 34:19-3(c). Contrary to Defendant's argument—that Plaintiff's disagreement with the dress policy was a "private concern," not covered by CEPA—"CEPA's protection from retaliation extends to the disclosure of discriminatory conduct by a person or company with whom an employer

maintains a business relationship." <u>Sample v. Marketstar Corp.</u>, No. CIV.A. 12-5538, 2014 WL 3894262, at *7 (D.N.J. Aug. 7, 2014). Plaintiffs opposition to what she believed was a discriminatory employment practice of an employer, is protected under CEPA. <u>Roach v. TRW</u>, Inc., 572, 727 A.2d 1055, 1063 (N.J. Super. App. Div.), <u>cert. granted</u>, cause remanded, 743 A.2d 847 (N.J. 1999); <u>see</u> <u>also</u> <u>Tegler v. Glob. Spectrum</u>, 291 F. Supp. 3d 565, 588 (D.N.J. 2018) (finding that a reasonable fact finder could conclude that conversations about behavior reasonably believed to violate the NJLAD "were the sort of 'objection' or 'disclosure' contemplated and protected by CEPA").

*2. Casual Connection*

Defendants argue that even if Plaintiff engaged in whistleblower protected activity that she cannot establish a causal relationship between any such activity and an adverse employment action. Briefly, the Court must first address the adverse employment actions asserted by Plaintiff, which are identical to those Plaintiff alleged in support of her FLSA/NJWHL retaliation claim, and some of which occurred prior to her complaint about the Press' Dress Policy.

Under CEPA "retaliatory action" is defined as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." <u>Ehling v. Monmouth-Ocean Hosp. Serv. Corp.</u>, 961 F. Supp. 2d 659, 673 (D.N.J. 2013) (quoting N.J. Stat. Ann. 34:19–2(e)); <u>see</u> <u>Keelan v. Bell Communications Research</u>, 674 A.2d 603 (N.J. Super. App. Div. 1996) ("The definition of retaliatory action speaks in terms of completed action. Discharge, suspension or demotion are final acts. 'Retaliatory action' does not encompass action taken to effectuate the 'discharge, suspension or demotion.'"). Plaintiff's allegations that certain disciplinary actions constitute adverse actions alone

must fail as "allegations of retaliation [that] are minor and have no impact on either plaintiffs' compensation or rank" are not adverse employment actions.  Hancock v. Borough of Oaklyn, 790 A.2d 186, 193 (N.J. Super. App. Div. 2002) (citing Zamboni v. Stamler, 847 F.2d 73, 82 (3d Cir. 1988)). Therefore, for the same reasons stated in the Court's analysis above, the only actionable adverse employment action that Plaintiff experienced was her July 2016 termination.

To demonstrate a causal link between Plaintiff's termination and her complaints about the Press' Dress Policy, she "must show that the 'retaliatory discrimination was more likely than not a determinative factor in the decision.'" Choy v. Comcast Cable Commc'ns, LLC, 629 F. App'x 362, 365 (3d Cir. 2015) (quoting Donofry v. Autotote Sys., Inc., 795 A.2d 260, 271 (N.J. Super. App. Div. 2001)). One way to establish causation is through temporal proximity. However, "[i]t is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's *prima facie* case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn." Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 178 (3d Cir. 1997). Here, Plaintiff cannot establish a strong inference of retaliation from temporal proximity alone. Plaintiff objected to the Dress Policy on or about April 11, 2016 and was terminated on July 5, 2016, almost 3 months later. See Choy v. Comcast Cable Commc'ns, LLC, 629 F. App'x 362, 365 (3d Cir. 2015) (finding even a "six-week period fails to raise an inference of causation").

Retaliation may also be inferred "from the circumstances surrounding the employment action including . . . inconsistencies or contradictions in the employer's proffered legitimate reasons for its action," and "circumstantial evidence of a pattern of antagonism following plaintiff's protected conduct." Robles v. U.S. Envtl. Universal

<u>Servs., Inc.</u>, 469 F. App'x 104, 107–08 (3d Cir. 2012) (citations omitted); <u>Kachmar</u>, 109 F.3d at 177 (citations omitted). In this case, Plaintiff alleges that "the facts, the circumstances and whole story of the ten months between Plaintiff's first protected activity and her termination demonstrate causation and pretext." Pl. Op. at 24.

First, Plaintiff provides sufficient evidence that, if believed, shows she was treated differently from others prior to her termination, after her opposition to the Dress Policy. Plaintiff claims that she was disciplined unfairly for failing to input her time shortly after her complaints regarding the Dress policy. She contends that other employees were given more time to comply the Dayforce system before being threatened with discipline. Indeed, Mr. Steiger acknowledged that other employees were failing to record their own time, yet he could not recall anyone, besides plaintiff, who was disciplined for that failure. Pl. Ex. 13. Weeks <u>after</u> Defendants disciplined Plaintiff, on June 7, 2016, Mr. Steiger sent an e-mail stating, "effective this week, if an employee is not inputting their hours, I will contact the manager of the department to begin with the process of disciplinary action." <u>Id.</u> Though Mr. Steiger testified that Plaintiff was written up because her failure to put in her time was "habitual," his June e-mail recognizes that he was "clocking many of [employees] in and out on <u>a regular basis</u>." Steiger Dep. 167 (emphasis added). Days after receiving that e-mail, Plaintiff wrote to Mr. Steiger concerned that she was being written up without warning, while it seemed no one else was. Pl. Ex. 15.

Plaintiff also argues that her discipline for the John Brooks and Fire Chief stories were "based on false allegations." Pl. Op. at 19. The record is replete with disputes over the underlying facts as to these two instances, for which Plaintiff denies the allegations that she missed deadlines and was not communicating with her supervisor. The Court

finds that at the very least, there is sufficient evidence to establish weaknesses, implausibilities in Defendants' explanations of Plaintiff's discipline. The e-mail chains, text messages, and disciplinary action show that Plaintiff did, at some point, write the story she was assigned, submitted both stories, and communicated with her supervisor. Viewing the facts in a light most favorable to Plaintiff, as the Court must, the record presents inconsistencies in the disciplinary actions in dispute, which form at least part of the basis for Plaintiff's termination. Levins v. Braccia, No. A-4290-07T2, 2009 WL 1658610, at *7 (N.J. Super. Ct. App. Div. June 16, 2009) ("If an employer gives a false reason or inconsistent explanations for the challenged employment action, that circumstance can be relevant to a determination of causation."). Furthermore, a reasonable fact finder could infer retaliatory animus from the contradicting evidence surrounding Plaintiff's discipline. Therefore, the Plaintiff has provided sufficient evidence of causation.

If a Plaintiff can establish a *prima facie* case of retaliation under CEPA, the burden shifts to the defendant to articulate a legitimate non-retaliatory reason for its adverse employment action. Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 92 (3d Cir. 1999). The parties do not dispute that Defendants have met their burden and provided a legitimate non-retaliatory reason for Plaintiff's termination. Defendants' articulated that Plaintiff was terminated pursuant to her performance issues, failure to abide by company policies, unsatisfactory work quality, lack of communication, and disrespectful conduct. Def. Brf. At 25-26.[7] Plaintiff's termination resulted from her July 5, 2016

---

[7] Defendants cite to the numerous disciplinary actions instituted against plaintiff and documented as well as e-mail exchanges and testimony mainted in this record to support its reasons.

disciplinary action, specifically recommending Plaintiff be terminated. That recommendation further provided the following reasons: Plaintiff's failure to communicate with her supervisors regarding hours worked and assignments, failure to timely fill in her time sheets, derogatory and unprofessional comments, and reluctance to take on an assignment because it was not on "her terms."

"Once the defendant articulates a legitimate reason for the adverse employment action, the presumption of retaliatory discharge created by the *prima facie* case disappears and the burden shifts back to the plaintiff. Then, "[t]o prevail at trial, the plaintiff must convince the factfinder both that the reason [given by the employer] was false, and that [retaliation] was the real reason." Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 92 (3d Cir. 1999) (quoting Woodson v. Scott Paper Co., 109 F.3d 913, 920 n.2 (3d Cir. 1997) (internal quotations omitted)) (citations omitted). At the summary judgment stage, "the court must determine whether the plaintiff has offered sufficient evidence for a reasonable jury to find that the employer's proffered reason for the discharge was pretextual and that retaliation for the whistleblowing was the real reason for the discharge." Id. at 92–93 (3d Cir. 1999).

Here, Plaintiff provides sufficient evidence for a reasonable jury to conclude that Defendants proffered reasons for Plaintiff's termination are pretextual. First the record creates a genuine factual dispute as to Plaintiff's alleged performance problems. As previously explained, Defendants cannot dispute that other employees were also failing to input time in Dayforce. Yet Mr. Steiger cannot recall disciplining any of those other employees. To be sure, Plaintiff was given multiple reminders to input her time worked into Dayforce; one reminder notified Plaintiff that a formal warning would ensue of she did not begin to input her time. However, a formal warning resulted from same incident

that prompted this reminder. Mr. Steiger distinguishes Plaintiff's conduct and justifies her warning by explaining that Plaintiff's failure to record time in Dayforce was a habitual problem. Even if Plaintiff's conduct was "habitual," she explained to Defendants that she could not record her time from home. She also provides evidence that the company rules for recording time were not clear. Specifically, she was told not to put in time worked before actually working those hours and therefore, could not always input time while in the office.

The record does not contain documentation of unsatisfactory work quality other than an incident in March 2016 concerning a misidentified name in Plaintiff's story, which is disputed by Plaintiff. Interestingly, that incident was not documented in Plaintiff's personnel file until May 2016 after Plaintiffs Complaints. Less than one month prior to Plaintiff's termination Mr. Keough, rejecting Plaintiff's request for a new supervisor stated, "you've had some strong stories lately." Pl. Ex. 20. The record also lacks evidence that Plaintiff was ever disciplined in her long tenure with the Press before late 2015. Defendants also claim that Plaintiff failed to abide by company policies, without citation to which policies they refer to. Although Defendants documented Plaintiff's alleged failure to follow "unwritten policies," Ms. Loder testified that news room did not have unwritten company policies.

Finally, Plaintiff was disciplined more than once for underlying issues of lack of communication, and disrespectful conduct, such as "unprofessional e-mails." Defendants claim Plaintiff's lack of communication caused staffing problems and Mr. Keough testified that Ms. Loder discussed communication difficulties she had with Plaintiff. Keough Dep. 39. Mr. Hughes also had problems "with being unable to reach [Plaintiff], communicate with her." Id. The Court finds, however, that genuine disputes

of material fact as to Plaintiff's communication are also present in the record. Plaintiff has provided e-mails showing her communications efforts with Ms. Loder. Those e-mails claim that Plaintiff responded to text messages from Ms. Loder and other employees. Even Defendants' final disciplinary action against Plaintiff conflicts with other evidence in the record. Although Plaintiff was disciplined for failure to communicate, the written discipline references several communications that Ms. Loder did have with Plaintiff. Additionally, Plaintiff was disciplined in-part for not recording her time worked on the Wednesday shift before the end of that day, even though the record shows that Plaintiff was told to have hours recorded "by at least the end of the week." Therefore, the Court finds that a reasonable fact finder could conclude that Defendants stated reasons for Plaintiff's termination are unworthy of credence and therefore, that Plaintiff's whistleblowing was the reason for her termination.

### C. Plaintiff's Claims under the New Jersey Law Against Discrimination

Defendants move for summary judgment on Plaintiff's claims under the New Jersey Law Against Discrimination ("NJLAD"). First, they argue that Plaintiff's discrimination claim fails because Plaintiff cannot establish a prima facie, as the record lacks any evidence that could give rise to an inference of discrimination. Second, Defendants argue that Plaintiff's retaliation claim also fails because Plaintiff cannot show she engaged in protected activity.

The NJLAD "was enacted with the express purpose of protecting civil rights, particularly in the area of employment discrimination, where the NJLAD declares that the opportunity to gain employment without fear of discrimination is a civil right." Thurston v. Cherry Hill Triplex, 941 F. Supp. 2d 520, 534 (D.N.J.

2008); see Fuchilla v. Layman, 537 A.2d 652, 660 (N.J. 1988) ("[T]he overarching goal

of the [NJLAD] is nothing less than the eradication 'of the cancer of discrimination.'"

(quoting Jackson v. Concord Co., 253 A.2d 793, 799 (N.J. 1969))).

The New Jersey Supreme Court has explained that the NJLAD is broad remedial

legislation, designed to prohibit employers from discriminating against employees with

respect to the terms and conditions of their employment on the basis of a protected

characteristic, such as race, religion, age, sex, and disability. See Quinlan v. Curtiss-

Wright Corp., 8 A.3d 209, 220 (N.J. 2010) ("We have been vigilant in interpreting the

[NJLAD] in accordance with that overarching purpose, and in recognition that it is . . .

remedial legislation that was intended to be given a broad and liberal

interpretation."); see also N.J. Stat. Ann. § 10:5-12(a) (listing the various protected

classes under the NJLAD). NJLAD additionally provides that it is unlawful "[f]or any

person to take reprisals against any person because that person has opposed any

practices or acts forbidden under this act or because that person has filed a complaint . .

. under this act. . . ." N.J. Stat. Ann. § 10:5–12(d)12(d).

Discrimination and retaliation claims brought under the NJLAD are both analyzed

under the abovementioned flexible burden-shifting framework established by the

United States Supreme Court in McDonnell Douglas. Viscik v. Fowler Equipment Co.,

800 A.2d 826 (N.J. 2002); Jackson v. Trump Entm't Resorts, Inc., 149 F. Supp. 3d 502,

509 (D.N.J. 2015). Under the McDonnell Douglas framework, plaintiff has the initial

burden of establishing a *prima facie* case of discrimination by pointing to evidence in

the record sufficient to create a genuine factual dispute that "s/he suffered an adverse

employment action . . . under circumstances that could give rise to an inference of

intentional discrimination" on the basis his/her protected class. <u>Makky v. Chertoff</u>, 541 F.3d 205, 214 (3d Cir. 2008).

Here, Plaintiff claims Defendants unlawfully discriminated against her on the basis of her gender by (1) "making and enforcing policies solely related to gender;" and, (2) allowing a Press editor to "assign favorable stories to his live in girlfriend instead of plaintiff." Compl. ¶ 85. Plaintiff also claims that "Defendant Steiger retaliated against plaintiff for her objections and claims of discrimination with respect to sex based policies of defendant which impacted women and were otherwise discriminatory." <u>Id.</u> at ¶ 88. She further alleges that "Defendants' Loder and Steiger aided and abetted the discriminatory treatment of plaintiff" and Defendants Keough and Loder particularly aided and abetted such treatment by "disciplining plaintiff for her complaints." <u>Id.</u> at ¶¶ 85-89.

1. *Discrimination under NJLAD*

Plaintiff's first claim for discrimination is based on the Press' groom and dress policy. The NJLAD provides that:

> Nothing in the provisions of this section shall affect the ability of an employer to require employees to adhere to reasonable workplace appearance, grooming and dress standards not precluded by other provisions of State or federal law, except that an employer shall allow an employee to appear, groom and dress consistent with the employee's gender identity or expression.

N.J.S.A. 10:5–12(p). Here, the appearance policy at issue was implemented for <u>all</u> employees at the Press and institutes a business casual attire for <u>both genders</u>. It is undisputed that the policy applies to both the men and women. Plaintiff alleges that the policy was, nonetheless, discriminatory toward women because it required women to

wear pantyhose, dictated their type of shoe wear, and allowed exceptions only for male employees.

Plaintiff's Complaint ignores the fact that the policy was revised to eliminate her main complaints. Under the policy in place at the time Plaintiff was employed at the Press, women were <u>not required</u> to weary pantyhose and were <u>permitted</u> to wear heels, so long as they were no higher than 3 inches. The policy contained other restrictions on footwear, but they applied to both men and women. In fact, Plaintiff admits that the revisions at least "partially" addressed her concerns. She testified that her real "issue" with the policy was that the IT department was given an exemption. To that extent, it is undisputed that the IT Department was given an exception for the no jean policy. The IT department, however, was not the only department given that expectation, the warehouse personnel and the pre-press personnel were also permitted to wear jeans. Plaintiff took no opposition to those exceptions. Her concerns regarding the IT department stressed that it was an all-male department.

Notwithstanding, such exception was not gender based. The Dress Policy was tailored to consider "customer contact," which was not an aspect of IT (or other exempt departments). Def. Ex 3. Thus, the exempt departments were unlike Plaintiff's position. It is also reasonable of Defendants to conclude that the duties performed by IT personnel warrant an alteration of Dress Policy. Moreover, "[w]hen an employer's 'reasonable workplace appearance, grooming and dress standards' comply with State or federal law prohibiting discrimination, even if they contain sex-specific language, the policies do not violate Title VII, and by extension, the [NJ]LAD." <u>Schiavo v. Marina Dist. Dev. Co., LLC</u>, 123 A.3d 272, 291 (N.J. App. Div. 2015). Therefore, Plaintiff fails to show Defendants' policy was discriminatory.

Plaintiff's next allegation of gender discrimination is for disparate treatment. To establish a *prima facie* case of gender discrimination, Plaintiff must show that: (1) she is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment decision; and (4) the adverse employment action was made under circumstances that give rise to an inference of unlawful discrimination. <u>Jones v. Sch. Dist. of Philadelphia</u>, 198 F.3d 403, 412 (3d Cir. 1999); <u>Santosuosso v. NovaCare Rehab.</u>, 462 F. Supp. 2d 590, 599 (D.N.J. 2006).

Plaintiff alleges discrimination based on assertions that an editor, Mr. Hughes, gave preferential treatment to his live-in girlfriend, another female employee. Defendant argues that Plaintiff fails to provide any evidence that could give rise to an inference of discrimination. The Court agrees. The record supports only that Plaintiff subjectively preferred the assignment of another female employee, who happened to be the editor's girlfriend.[8] <u>See</u> <u>Erickson v. Marsh & McLennan Co.</u>, 569 A.2d 793, 802 (N.J. 1990) (finding "no reason to extend the protection of LAD to sex-discrimination claims based on voluntary personal relations in the work place"). In fact, the record is devoid of any evidence that Plaintiff was treated differently from any other male employees. Therefore, Plaintiff fails to provide evidence that she was discriminated *because of her sex*. Thus, the Court grants summary judgment in favor of Defendant on Plaintiff's claims for discrimination under the NJLAD in Count II. [9]

---

[8] The assignment at issue was not even included in Plaintiff's ordinary work. However, the female employee was indisputably qualified to handle the assignment.

[9] The Court notes that Plaintiff further abandons her discrimination claim by failing to address it entirely in her opposition brief.

### 2. Retaliation under NJLAD

Plaintiff's Complaint also alleges a retaliation claim under the NJLAD. To establish a *prima facie* case of retaliation, Plaintiff must show that (1) she engaged in a protected activity known to the defendant; (2) she was thereafter subjected to an adverse employment decision by the defendant; and (3) there was a causal link between the two. <u>Moore v. City of Philadelphia</u>, 461 F.3d 331, 340–41 (3d Cir. 2006). "The central element of a retaliatory discharge claim under LAD is that the plaintiff be 'engaged in a protected activity, which is known by the alleged retaliator.'" <u>Erickson</u>, 569 A.2d at 803 (quoting <u>Velantzas v. Colgate–Palmolive Co.</u>, 536 A.2d 237 ( N.J. 1988)). Here, Defendants assert that Plaintiff has not engaged in protected activity and therefore, fails to meet her initial burden.

"[A] person engages in a protected activity under the LAD when that person opposes any practice rendered unlawful under the LAD." <u>Young v. Hobart W. Grp.</u>, 897 A.2d 1063 (N.J. Super. App. Div.2005); <u>Bradley v. Atl. City Bd. of Educ.</u>, 736 F. Supp. 2d 891, 900 (D.N.J. 2010) ("protected activity includes 'opposing practices or acts forbidden under [the statute]' as well as filing a complaint." (citations omitted)). To be considered protected activity, an employee's complaint "must concern discrimination" and moreover, must be more than a general complaint of unfair treatment. <u>Dunkley v. S. Coraluzzo Petroleum Transporters</u>, 98 A.3d 1202, 1208 (N.J. Super. App. Div. 2014); <u>Barber v. CSX Distrib. Servs.</u>, 68 F.3d 694, 702 (3d Cir. 1995).

Here, Plaintiff contends that her "objection" to Mr. Hughes allotting his girlfriend a more favorable assignment constitutes protected activity under NJLAD. Pl. Op. at 21. This complaint, however, did not concern discrimination. At no point did Plaintiff complain that she was given less favorable assignments because she was a woman.

Rather, her objection was a general complaint of what she subjectively viewed as unfair treatment. Therefore, Plaintiff did not engage in protected activity under the NJLAD when she questioned supervisor and employee relationships.

Plaintiff also alleges that she engaged in protected activity by: "objecting to the dress code policy, equality notice, [and] unequal pay and promotions among men and women." Pl. Op. at 13. Plaintiff's Complaint does not plead any facts or claims regarding objections to unequal pay or the Press' Equality Notice. Accordingly, the Court will not consider those acts as evidence that Plaintiff engaged in protected activity.[10] As for Plaintiff's complaints that the Press' Dress Policy was "sexist" toward women, the Court finds that such complaint qualifies as protected activity pursuant to NJLAD. It is undisputed that Plaintiff told Mr. Steiger about her concerns with the Dress Policy, which she felt was discriminatory. See Def. SMF ¶ 34; Pl. SMF ¶ 85. As previously stated, Plaintiff thought the policy was sexist towards women. Although revisions to the Policy addressed a number of the issues Plaintiff had with the Policy, at the time of her complaint, Plaintiff was unaware of those changes, and persisted to object. Def. SMF ¶¶ 34-35.

According to the New Jersey Supreme Court, "when an employee voices a complaint about behavior or activities in the workplace that he or she thinks are discriminatory, [the court does] not demand that he or she accurately understand the nuances of the [NJ]LAD or that he or she be able to prove that there was an identifiable

---

[10] Courts have granted summary judgment on claims a plaintiff asserts based on new theories of liability. New theories of liability set forth in responsive papers to a motion for summary judgment are "generally considered 'too late'" and thus, do not create genuine issue of material fact to preclude summary judgment. Bell v. Lockheed Martin Corp., 2014 U.S. Dist. LEXIS 87485, *76 (D.N.J. June 27, 2014); Laurie v. Nat'l Passenger R.R. Corp., 105 F. App'x 387, 392 (3d Cir. 2004).

discriminatory impact upon someone of the requisite protected class." Id. Therefore, it is inapposite that Plaintiff has not produced sufficient evidence to show the Press' Dress Policy was in fact discriminatory or that she and/or other female employees were treated differently based on their gender. The NJLAD does require a reasonable "good faith belief that the conduct complained of violates the [Act]." Battaglia v. United Parcel Serv., Inc., 70 A.3d 602, 620 ( N.J. 2013). Here, Defendants do not suggest or argue that Plaintiff acted in bad faith. Therefore, Plaintiff engaged in protected activity when she opposed the Press' Dress Policy.

The issue then, is that when "a plaintiff's 'state law claims arise from the same set of facts surrounding his[/her] [CEPA] retaliation claim," CEPA's waiver provision deems those state claims waived. N.J. Stat. § 34:19–8; Baldassare v. State of N.J., 250 F.3d 188, 202 (3d Cir. 2001) ("CEPA prohibits litigating duplicative claim[s].") In the present case, Plaintiff's CEPA claim survives based only on Plaintiff's whistleblowing activity concerning her opposition to the Dress Policy. Therefore, her CEPA and NJLAD retaliation claim are based entirely on the same conduct, for which Plaintiff provides the same evidence. As such, the Court will dismiss Plaintiff's retaliation claim under NJLAD because it is now subsumed under CEPA. See Smith v. Twp. Of E. Greenwich, 519 F. Supp. 2d 493, 510 (D.N.J. 2007), aff'd, 344 F. App'x 740 (3d Cir. 2009), as amended (Nov. 3, 2009). Accordingly, the Court will grant summary judgment on Plaintiff's NJLAD retaliation claim, and dismiss Count II of Plaintiff's Complaint.

### D. Punitive Damages

Defendants also move for summary judgment on Plaintiff's claims for punitive damages. They argue that Plaintiff "cannot present any evidence of conduct that exhibits malice or reckless disregard for her rights," or produce any evidence of "particularly

egregious conduct" so as to hold Defendants liable for punitive damages. Def. Brf. at 29-32. The Court Agrees.

The only remaining claim from which Plaintiff may seek punitive damages, is her CEPA retaliation claim (COUNT III). Under CEPA, "[p]unitive damages are to be awarded 'when the wrongdoer's conduct is especially egregious.'" <u>Lehmann v. Toys R Us, Inc.</u>, 626 A.2d 445, 464 (N.J. 1993) (quoting <u>Leimgruber v. Claridge Assocs.</u>, 375 A.2d 652 (N.J. 1977)). An employer may only be liable for punitive damages if there was "actual participation by upper management or willful indifference." <u>Abbamont v. Piscataway Twp. Bd. of Educ.</u>, 138 N.J. 405, 419 (1994). The Supreme Court of New Jersey has explained that "to be a part of 'upper management,' 'the employee should have either (1) broad supervisory powers over the involved employees, including the power to hire, fire, promote, and discipline, or (2) the delegated responsibility to execute the employer's policies to ensure a safe, productive and discrimination-free workplace.'" <u>Longo v. Pleasure Prods., Inc.</u>, 215 N.J. 48, 59, 71 A.3d 775, 782 (2013) (quoting <u>Cavuoti v. New Jersey Transit Corp.</u>, 735 A.2d 548, 557 (N.J. 1999)). The inquiry of who meets the definition of "upper management" is fact-intensive. Id. Here, the Court need not determine whether Plaintiff's supervisors involved in the decision to terminate her employment were in fact upper management because the Court finds that record in the present case lacks any evidence of egregious conduct.

The test for egregiousness is satisfied "if plaintiff has proven 'an intentional wrongdoing in the sense of an evil-minded act or an act accompanied by a wanton and willful disregard for the rights of [plaintiff].'" <u>Id.</u> Courts have also found sufficient evidence of egregious conduct where the evidence demonstrates defendant acted with "actual malice." <u>Quinlan v. Curtiss-Wright Corp.</u>, 274, 8 A.3d 209, 230 (N.J. 2010).

Plaintiff has not cited to any evidence that suggests Defendants acted with malice or willful disregard for her rights at any point during her employment. To the contrary, testimony provides that, at times, Plaintiff was guided to the appropriate personnel to contact with concerns and afforded the opportunity to voice her complaints. In addition, Defendants provide evidence of written company policies against discrimination and retaliation, and respective complaint procedures. Def. SMF ¶¶ 2-5, 16-19. Testimony further reveals that employees, including management, underwent training on anti-discrimination and harassment in the workplace. Such evidence shows the good faith effort of the Defendant employer. See Kolstad v. ADA, 527 U.S. 526, 544 (1999) ("[I]n the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good faith efforts to comply with [anti-discrimination legislation]"). Therefore, the Court will grant summary judgment and dismiss Plaintiff's claims for punitive damages.

IV.     Conclusion

For the forgoing reasons, the Court GRANTS in-part and DENIES in-part Defendants' Motion for Summary Judgment, dismissing Plaintiff's FLSA retaliation claim in Count I and both of Plaintiff's NJLAD Claims in Count II, and striking Plaintiff's prayer of relief for Punitive Damages.

An appropriate Order shall issue.

Dated: November 14, 2019

_/s/ Joseph H. Rodriguez_____
Hon. Joseph H. Rodriguez,
UNITED STATES DISTRICT JUDGE